# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION  II

| | |
|---|---|
| In the Matter of the Marriage of:<br><br>ALENA MILES,<br><br>                      Respondent,<br><br>   and<br><br>MICHAEL E. MILES,<br><br>                   Appellant. | No.  59721-7-II<br><br><br><br>UNPUBLISHED OPINION |

LEE, J. — Following a one-day trial, Michael Miles appeals the trial court's final divorce order (dissolution decree) in his divorce from Alena Miles.  Specifically, Michael's[1] claims include (1) improper service of process, (2) improper judicial transfer, (3) misclassification of assets, (4) unjust and inequitable distribution of assets, (5) abuse of discretion in an award of spousal maintenance to Alena, and (6) judicial bias.

The record shows that Michael was properly served; therefore, Michael's claim of improper service fails.  The record also shows that the case was administratively reassigned to another judicial department in compliance with both local court rules and applicable statutes; therefore, the administrative reassignment of the case to another judicial department was proper.  Substantial evidence in the record supports the trial court's classification and distribution of assets; therefore, the trial court did not err in its disposition of property.  And the record shows that Alena

---

[1]  Because both parties share the same last name, this opinion will refer to the parties by their first names to avoid confusion.  No disrespect is intended.

has neither income nor employment prospects and suffers from major disability; therefore, the trial court did not abuse its discretion in awarding Alena spousal maintenance. Finally, because Michael fails to offer any evidence of judicial bias, his claim of bias fails. Accordingly, we affirm.

FACTS

A. BACKGROUND

Michael and Alena met and began an intimate relationship in 1993. They married in October 2001 and share a child together.[2] Both Michael and Alena also have children from prior relationships.

Throughout Michael and Alena's marriage, Michael was a union truck driver. Michael has a pension through his union affiliation. Michael drove for two different trucking companies, and he earned an income of over $10,000 per month from driving trucks.

Between 2002 and 2008, Alena owned her own business and worked as a wedding florist. However, in 2002, and then again in 2008, Alena was involved in serious car accidents that left her disabled. She sustained significant injuries to her back, including crushed discs in her spine, and after both accidents, needed rehabilitation to be able to walk. Alena was involved in a third accident in 2010, in which she incurred injuries to her "midback, upper back, and neck . . . and a torn rotator cuff, torn biceps tendon." Verbatim Rep. of Proc. (VRP) at 35. Following the 2010 accident, she required five years of rehabilitation before she was able to walk again.

Alena has not worked since 2008 on the recommendation of her doctors. In 2013, Alena applied for disability benefits from the Department of Social and Health Services and for

---

[2] Alena and Michael's child is now an adult.

2

supplemental security income through the Social Security Administration. Around the time of her application, Alena stayed with a friend to "just have some peace from the strain of [her] marriage so that [she] could start focusing on getting [her] ability to walk," as she could not walk at the time. VRP at 55. Alena would go home during the day to be with her children and spend nights at her friend's house. Accordingly, Alena indicated on her application that she was living apart from Michael in August 2013.

Alena's application for supplemental income was denied.[3] The denial was based on Alena's insufficient work hours to qualify.

Starting around 2013, Alena was in charge of paying household bills, including mortgage and insurance payments. Michael would deposit his paychecks into a joint bank account that he and Alena shared. Alena would allocate some funds for Michael's own spending, which she would transfer into an individual bank account for Michael, and she would use the remainder to pay bills. This arrangement was at Michael's request. Michael struggled with spending and wanted to limit his spending.

In December 2017, Michael and Alena purchased a new home. Alena's adult son, Trevor Summers, was also listed on the deed as possessing an undivided interest in the home with Michael and Alena. Trevor made some mortgage payments on the house to assist Michael and Alena, but he never resided in the house.

Just prior to the 2017 house purchase, Alena and Michael entered into a written agreement that purportedly addressed Michael's spending habits. The agreement, signed by Michael,

---

[3] Alena briefly received food stamps from the State because she "wasn't receiving any money from Michael for help." VRP at 55.

emphasized Michael's understanding and agreement to allow Alena to manage the household finances, Michael's agreement not to make any other large purchases in the interim—specifically of any cars—and Michael's acknowledgment of Alena's disability and inability to work. Following Michael and Alena's house purchase, Michael almost immediately purchased a $68,000 vehicle.

B.     PROCEDURAL HISTORY

1.     Petition for Divorce

On March 22, 2023, Alena filed a petition for divorce (dissolution) in superior court. In the petition, Alena stated that she and Michael lived in the same household and that the marital community ended on the date of the petition filing. She requested the superior court to generally divide their property fairly and equitably, and she requested a restraining order against Michael— specifically an order for "[d]o not disturb" and "[s]tay away." Clerk's Papers (CP) at 1935 (boldface omitted). Alena also requested that she be allowed to remain in the family home while Michael found alternative housing. Alena did not serve Michael with any documents at the time she filed the petition.

On April 17, Alena filed an ex parte motion for an immediate restraining order. On April 19, the trial court held a hearing on Alena's motion. Michael was not present at the hearing. The trial court inquired about notice of the hearing to Michael, to which Alena's counsel responded that he had emailed Michael notice.

The trial court entered an ex parte immediate restraining order (IRO) and hearing notice, but the court denied Alena's requests for "[d]o not disturb" and "[s]tay away." CP at 1965 (boldface omitted). The IRO required Alena to serve a copy of the IRO on Michael. Finally, the

IRO stated that the parties should maintain "the financial status quo" until the next hearing, which was set for May. CP at 1967.

At 6:45 p.m. on April 19, Stephanie Brester personally served Michael at his place of work. She served several documents, including the petition for divorce, the summons, the order setting case schedule, the motion for the restraining order, and the IRO, among others. The case was assigned to Judge Williams in Department 20.

The summons instructed Michael on response timelines. Specifically, the summons stated: "Your *Response* must be served on Petitioner within 20 days of the date you were served this *Summons* . . . . If the case has been filed in court, you must also file your *Response* by the same deadline." CP at 1983 (emphasis in original).

On May 10, Michael filed a "Respondent Declaration," in which he "enter[ed] his formal notice to appear" as a self-represented litigant. CP at 1985. In his declaration, Michael confirmed receiving notice of the petition for divorce on April 20. Additionally, Michael substantively responded to Alena's petition, including a request that he be allowed to remain in the family home.

On May 25, Michael filed several more documents, including letters of support, a notice of appearance, a supplemental declaration, and a "Response to Petition about a Marriage." CP at 2065. At a hearing on May 31, where both Michael and Alena were in attendance, the trial court reviewed the April 19 IRO. The trial court entered a temporary order continuing the April 19 IRO

until another hearing that was set for June. After the May hearing, Michael obtained counsel, Gina Duncan, who filed a notice of appearance on June 14.[4]

On June 23, pursuant to Pierce County Superior Court Local Civil Rule (PCLR) 40,[5] the superior court administratively reassigned the case from Judge Williams in Department 20 to Judge Chushcoff in Department 4. The reassignment was based on a "Judicial Assignment Conflict." CP at 411. The superior court provided notice of the administrative transfer to counsel for both Michael and Alena.

2.     Trial

a.     Alleged improper service

The parties proceeded to trial before Judge Chushcoff in March 2024.[6] Michael appeared at trial as a self-represented litigant.

At the start of trial, Michael moved to dismiss the case based on improper service. Michael claimed that the divorce documents "never came in the mail." VRP at 3. The trial court clarified that Michael should have been served personally. Michael then referenced the hearing on May 31, 2023, at which a superior court commissioner had instructed Alena and her counsel to mail certain documents to Michael.

---

[4] Duncan withdrew as Michael's counsel in November 2023. Michael was later represented by Beverly Allen from April 2024 through May 2024. Outside of those timeframes, Michael appeared as a self-represented litigant.

[5] PCLR 40 provides: "If the assigned judicial department is unable to hear a preassigned matter, the Court may transfer that case to the Court Administrator for reassignment." PIERCE COUNTY SUPER. CT. LOC. CIV. R. (PCLR) 40(e)(1).

[6] Between June 2023 and March 2024, the parties filed various documents, including declarations, motions, and responses, most of which are not pertinent to the issues on appeal.

In response, Alena's counsel replied that this was the first time Michael had ever raised the issue of improper service. Alena's counsel stated that proof of service had been filed and that Michael had filed a response that did "not bring up any issue regarding service." VRP at 4.

Michael asserted that he had previously argued lack of service. The trial court then stated:

All right. There's a document called proof of personal service filed April 20, 2023, saying that Stephanie Brester, on April 19, 2023, at 6:45 p.m. at 701 6th Street Northwest in Auburn, served you, Mr. Miles, with petition, summons, order setting case schedule, and three or four or five other documents.

[MICHAEL]: Well, I—that was the time I wasn't there; right? Yeah. I wasn't at work at that time. I have documentation from my terminal manager. I didn't get back in until like 7:15, 7:20. Oh, this was—here's an example of what I got, Your Honor. It was a piece of paper like this. This is what I got.

[COURT]: You would have gotten a lot more than that, according to this. There was a response filed on May 25th.

. . . .

[MICHAEL]: Yeah, I think it was May 31st, Your Honor.

[COURT]: On May 23, 2023, and signed by you electronically.

. . . .

. . . And it's your response to the petition.

VRP at 4-5.

Michael continued to insist that he had not received proper service. But the trial court stated:

[COURT]: Here I got a document that says that you were served.

[MICHAEL]: Your Honor, I wasn't served.

[COURT]: It was filed . . . a year ago.

7

[MICHAEL]: No service, Your Honor.

[COURT]: I don't know what to tell you, Mr. Miles. You had a lawyer in this matter. You filed a response to this matter. The response didn't say anything about service of process problems.

[MICHAEL]: Well, that wasn't—that wasn't the first set of documents.

[COURT]: Yes, it was. The response is—the response looks at the petition and says, I agree with this paragraph or this paragraph or this paragraph, and the petition is part of the original service of process, which is what the declaration of service says you got.

[MICHAEL]: I never got it, Your Honor.

[COURT]: How did your lawyer respond to it if—or how did you respond to it if—

[MICHAEL]: I have been responding all this time about I haven't been served.

[COURT]: You filed a response to the petition answering every one of those paragraphs without having it? How did you do that?

[MICHAEL]: Well, my lawyer, she must have did [sic] that.

[COURT]: Well, the response is signed by you and it looks like it came at a time when you didn't have a lawyer. The response is dated May 25th.

[MICHAEL]: It couldn't—

[COURT]: Well, it's filed May 25th.

[MICHAEL]: Yes.

[COURT]: I read it to you a minute ago. That was signed by you.

VRP at 8-9.

Alena's counsel noted that Brester, the individual who served Michael, was present in the courtroom in the event the trial court wished to hear from her. The trial court agreed to examine Brester regarding the circumstances of Brester's service to Michael.

Brester testified that she personally served Michael on April 19, 2023, with the petition for divorce, summons, and other documents in the parking lot in front of his work. Brester stated, "I waited until he walked to his car and I walked up and I handed him the papers by his driver's door and he took them, and I walked back to my car and left." VRP at 16. Brester confirmed that it was Michael to whom she gave the papers.

The trial court asked Michael if he wished to ask Brester any questions. Michael declined. The trial court then made a ruling from the bench that Michael was properly served. The trial court stated:

> Well, I guess what I'm going to say, Mr. Miles, is I am finding you were served. I've got proof from [Brester], I've got the writing, I've spent all this time—you've participated. You hired a lawyer, you filed a response to the petition, you didn't claim a lack of service of process in those documents. You've either—if you weren't served, you were waived [sic]. Apparently, to me, the preponderance of the evidence is that you were served.

VRP at 17. Michael then stated he could not move forward with trial and again insisted he was not properly served.

[MICHAEL]: Your Honor, I wasn't served.

[COURT]: Well, I'm finding that you were, so you're stuck with that, so here we are, Mr. Miles.

[MICHAEL]: You know what, Your Honor, I ask you to excuse yourself.

[COURT]: I'm not going to recuse myself.

9

VRP at 18. Michael requested a brief recess "[t]o get a federal lawyer." VRP at 20. The trial court granted a recess.

        b.     Judicial bias

Following the recess, Michael again asserted that he was not served and argued that his rights were being violated.

> [MICHAEL]: Well—and then I can't get a fair trial because you don't believe me. I'm taking the 5th, Your Honor.

> [COURT]: Is it not a fair trial if I don't?

> [MICHAEL]: I didn't say that.

> [COURT]: Hold on a second.

> Would it be an unfair trial if I don't believe a witness that your wife calls?

> [MICHAEL]: Well, let me call a witness, then.

> [COURT]: You'll get that chance before we're said and done here, but there's a process.

> [MICHAEL]: I cannot speak.

> [COURT]: You can speak, Mr. Miles. You can choose not to. That's up to you.

> [MICHAEL]: Okay.

> [COURT]: All right. So now let's get back on track with our trial.

VRP at 22-23.

The trial court asked the parties if they had any pretrial motions. Michael re-raised his motion to dismiss based on lack of service. The trial court denied the motion.

Michael then requested to leave the courtroom. The trial court warned Michael that he could leave, but the trial would proceed in his absence. In response, Michael requested that his witness speak before the trial. The trial court explained that Alena, as the petitioner in the proceedings, would be allowed to present her case first, which could be followed by Michael's or Michael's witnesses' testimony. The trial court informed Michael that it would be in his interest to attend trial. Michael again stated that he was not served and asked the judge to recuse himself because Michael's "rights [had] been violated." VRP at 26. When the judge did not recuse, Michael left the courtroom.

Midway through trial, Michael filed a document "ordering request of disqualification of judge," and noted it for a motion hearing on April 5. VRP at 96. Michael alleged that the trial court had not yet made any discretionary rulings in the case and could be disqualified under RCW 4.12.050. In addressing the motion, the trial court stated that he had previously ruled on Michael's motion to dismiss, which "was a motion for discretionary judgment," and therefore, he could not be disqualified under RCW 4.12.050. VRP at 96. Trial proceeded.

c.      Trial testimony

During trial, Alena testified consistent with the facts presented above. She submitted several exhibits, including documentation of her health issues and inability to work; Michael and Alena's bank account statements and tax returns; Michael's paystubs; and their mortgage, loans, and credit card statements.

The evidence showed that prior to trial, Michael had redirected his paychecks to an individual bank account in his name, contrary to superior court orders.[7] Accordingly, several of their accounts had delinquent notices because Alena was unable to make payments without Michael's income.

Alena testified that she and Michael owned several cars, including a 2019 Lexus, which Alena primarily drove. Additionally, they owned a 2018 Kia and a Dodge Charger. The Lexus and the Charger both had outstanding loans. Alena submitted the Kelley Blue Book values of the vehicles as evidence of their value. Alena also testified that following separation, Michael retained possession of the Kia. Prior to trial, and against court orders, Michael sold the Kia for approximately $14,800 and kept the proceeds. Following Michael's sale of the Kia, he bought a Tesla for himself for approximately $65,000. Alena only discovered the purchase when she received notice from their car insurance company regarding a request from Michael to replace the Kia on their insurance policy with the Tesla.

Alena requested that the marital home be sold and confirmed that Summers[8] wished the home to be sold as well. Alena stated that she could not afford to keep the house. She also requested that the trial court award her "the amount that [Michael] hasn't paid [based on prior court orders] and . . . should be paying . . . to be offset by any interest that he has in the house." VRP at 30. Alena asked to be awarded the Lexus. Alena acknowledged that the Tesla was a post-

---

[7] In an August 2023 temporary order, the trial court ordered Michael to split his paychecks 50/50 with Alena.

[8] Summers was not a party to the case.

separation asset; however, she requested that the remaining vehicles be sold with proceeds split between the parties.

Alena requested spousal maintenance based on the length of her relationship with and marriage to Michael. She testified that she had no source of income. Alena also requested that once Michael no longer earned income, that she receive 50 percent of his social security benefits as continued spousal maintenance for the remainder of her life or his life.

> d.      Division of property and final divorce order

On May 17, the trial court entered a final divorce order. The trial court found that Michael and Alena had married in October 2001 and separated in March 2023. The trial court classified the house, Lexus, Charger, Kia proceeds, and a 2009 Camry as community property. The trial court classified the Tesla as Michael's separate property. Additionally, each party's personal belongings and bank accounts were classified as their own separate property.

Alena was awarded the house, worth $613,276.90, and Lexus, worth $35,600. Michael was awarded the Charger, worth $75,000, 2009 Camry, worth $1,000, and proceeds from the Kia sale, valued at $14,490. Additionally, each party was assigned the debts associated with the assets they were awarded. The initial division of assets resulted in a 73.73/26.27 percent split between Alena and Michael, respectively. However, the trial court awarded Michael a $20,000 lien against the house for "an equitable division [of] the community estate." CP at 59. The final division resulted in a 56.38/43.62 percent split between Alena and Michael.

Additionally, the trial court awarded lifetime spousal maintenance to Alena. The trial court based the award on Alena's disability and inability to work, along with Michael's significant regular income. The trial court ordered that, beginning in June 2024, Michael pay Alena $3,000

per month[9] for 60 months or until Michael retires, whichever occurs first, at which point spousal maintenance to Alena would be reduced to $1,500 per month. Finally, the trial court ordered that Michael's retirement account "should be divided equally with [Alena]" based upon Michael's accruals up until the date of separation. CP at 61.

Michael appeals.

ANALYSIS

Michael raises several challenges on appeal, including improper service, improper judicial transfer, and judicial bias. Michael also assigns error to the trial court's characterization and division of marital assets and the award of spousal maintenance to Alena. We hold Michael's claims fail.

A.  SERVICE OF PROCESS

1.  Legal Principles

A party commences an action in a domestic relations case by filing a petition or by serving a copy of a summons together with a copy of the petition. CR 4.1(a). "Proper service of the summons and complaint is essential to invoke personal jurisdiction over a party." *In re Marriage of Markowski*, 50 Wn. App. 633, 635-36, 749 P.2d 754 (1988); *see also* CR 4(d)(2). Service of process must comply with constitutional and statutory requirements. *Scanlan v. Townsend*, 181 Wn.2d 838, 847, 336 P.3d 1155 (2014); RCW 26.09.030. Courts review de novo whether service of process was proper. *Scanlan*, 181 Wn.2d at 847.

---

[9] One section of the final divorce order indicated a spousal maintenance award of $2,000 per month while another section indicated $3,000 per month. This was a scrivener's error, and the record shows that it was the trial court's intention to award $3,000 per month. The spousal maintenance amount of $3,000 per month was clarified in post-trial motions and orders.

When a defendant alleges improper service, the plaintiff has the initial burden to establish a prima facie case that service was proper. *In re Dependency of G.M.W.*, 24 Wn. App. 2d 96, 117, 519 P.3d 272 (2022), *review denied*, 1 Wn.3d 1005 (2023). A plaintiff may establish a prima facie case by filing a declaration from the person who served process, "regular in form and substance." *Id.* at 117-18. The burden then shifts to the defendant to show by clear and convincing evidence that service was improper. *Castellon v. Rodriguez*, 4 Wn. App. 2d 8, 16-17, 418 P.3d 804 (2018). "Clear and convincing evidence exists when the ultimate facts are shown to be 'highly probable.'" *G.M.W.*, 24 Wn. App. 2d at 118 (internal quotation marks omitted) (quoting *In re Parental Rts. to K.M.M.*, 186 Wn.2d 466, 478, 379 P.3d 75 (2016)). "A judgment entered without proper service of the summons and complaint is void for lack of jurisdiction." *Am. Express Centurion Bank v. Stratman*, 172 Wn. App. 667, 672, 292 P.3d 128 (2012).

A defendant waives the defense of insufficient service in certain circumstances. *Blankenship v. Kaldor*, 114 Wn. App. 312, 318, 57 P.3d 295 (2002), *review denied*, 149 Wn.2d 1021 (2003). "The waiver can occur in two ways: (1) 'the defendant's assertion of the defense is inconsistent with the defendant's previous behavior' or (2) 'the defendant's counsel has been dilatory in asserting the defense.'" *Id.* (quoting *Lybbert v. Grant County*, 141 Wn.2d 29, 39, 1 P.3d 1124 (2000)); *accord Castellon*, 4 Wn. App. 2d at 15.

2.      Michael Properly Served

Michael argues that he was not properly served with the petition for divorce or summons, in violation of CR 4 and the United States and Washington constitutions. Specifically, he argues that Alena filed her petition for divorce on March 22, 2023, but did not serve him within a 20-day "required" window. Br. of Appellant at 16.

Here, Alena has the initial burden to establish a prima facie case that service was proper. *G.M.W.*, 24 Wn. App. 2d at 117. The record shows Alena initially filed the petition for divorce on March 22, 2023. Michael was personally served by Brester on April 19, 2023. Brester served several documents, including the petition for divorce, the summons, the order setting case schedule, the motion for the restraining order, and the IRO, among others.

On April 20, 2023, Brester filed proof of personal service in the superior court. Further, Brester testified that she had personally served Michael with the documents outside his work and that she was familiar with Michael because she had served him several times throughout the proceedings. Thus, based on evidence in the record, Alena met her burden of establishing a prima facie case that service was proper. *Id.*

To prevail on his claim, Michael must demonstrate with clear and convincing evidence that service was improper. *Castellon*, 4 Wn. App. 2d at 16-17. Michael fails to do so.

First, Michael argues that Alena was required to serve him within 20 days under CR 4(c). However, the civil rules do not support his argument.

CR 4.1(a) states that in domestic relations actions:

Actions authorized by RCW 26.09 shall be commenced by filing a petition or by service of a copy of a summons together with a copy of the petition on respondent as provided in rule 4. Upon written demand by the respondent, the petitioner shall pay the filing fee and file the summons and petition within 14 days after service of the demand or the service shall be void. No summons is necessary if both spouses sign a joint petition or if the respondent files a written joinder in the proceeding.

CR 4(c), which Michael relies on, states:

Service of summons and process, except when service is by publication, shall be by the sheriff of the county wherein the service is made, or by the sheriff's deputy, or by any person over 18 years of age who is competent to be a witness in the action, other than a party. Subpoenas may be served as provided in rule 45.

Nor is there a 20-day service of summons requirement found in RCW 26.09.030, which discusses the filing of a petition for dissolution of a marriage or domestic partnership. *See generally* RCW 26.09.030.

The only reference to a 20-day window for service of a summons is found in CR 4(a)(2), which states:

> Unless a statute or rule provides for a different time requirement, the summons shall require *the defendant to serve a copy of the defendant's defense* within 20 days after the service of summons, exclusive of the day of service. If a statute or rule other than this rule provides for a different time to serve a defense, that time shall be stated in the summons.

(Emphasis added.) Thus, the 20-day requirement applied to *Michael*, not Alena. This same 20-day deadline for Michael to file a response to Alena's petition was noted in the summons he received. The summons stated: "Your *Response* must be served on Petitioner within 20 days of the date you were served this *Summons* . . . . If the case has been filed in court, you must also file your *Response* by the same deadline." CP at 1983 (emphasis in original).

Second, Michael argues that the trial court "failed to provide [him] with the requisite opportunity to offer evidence or testimony to rebut [Alena]'s prima facie showing of service" and this error "requires reversal." Reply Br. of Appellant at 6. The record, however, shows that the trial court made a genuine inquiry into Michael's claim of lack of service. The trial court looked into the court file to find the proof of personal service Brester filed in April 2023, engaged in a dialogue with Michael explaining service procedure, took testimony from Brester about her service on Michael, and allowed Michael an opportunity to question Brester.

Michael stated that he was not at work when Brester arrived to serve the documents. After Michael's continued insistence that he was improperly served, the trial court swore in Brester and asked her questions about her service of documents on Michael. Brester confirmed that she had personally served Michael outside his place of work on April 19, 2023, around 6:45 p.m. The trial court then asked Michael whether he wanted to question Brester. Michael declined. Other than repeatedly saying he was not served, Michael did not offer any evidence that he was improperly served. Thus, contrary to Michael's contention, the record shows that the trial court offered Michael the opportunity to rebut Alena's prima facie showing of proper service.

The trial court then found, based on the evidence, that Michael was properly served. The trial court cited to the proof of personal service, Brester's testimony, Michael's participation in and response to the proceedings, and the fact that Michael never raised the issue of improper service before the first day of trial. Based on the record, Michael fails to establish by clear and convincing evidence that he was improperly served. *G.M.W.*, 24 Wn. App. 2d at 118. Accordingly, Michael was properly served, so his challenge fails.[10]

3.      Waiver

Michael argues he did not waive the defense, in part because his "decision to retain counsel and appear voluntarily are insufficient to find waiver of personal jurisdiction." Reply Br. of Appellant at 9. Even if service was improper as Michael alleges, Michael has waived the defense of insufficient service. *Blankenship*, 114 Wn. App. at 318.

---

[10] Because we hold that Michael was properly served, the trial court orders issued throughout the proceedings were not void for lack of service. *See Am. Express Centurion Bank*, 172 Wn. App. at 672. Thus, Michael's argument that the trial court's orders were void also necessarily fail.

Here, the record shows that on May 25, 2023, Michael filed a response to Alena's petition, a declaration, a notice of appearance to appear as a self-represented litigant, and "letters of support." CP at 2042. Michael's response to the petition was substantive and stated whether he agreed or disagreed with Alena's contentions in the petition, along with requests for court orders against Alena. In his declaration, which Michael wrote "to clarify the answers [he] provided in (RSP) 'Response to Petition about a Marriage,'" Michael acknowledged receipt of the divorce paperwork and provided background on his relationship with Alena. CP at 2058.

Furthermore, approximately two weeks after he filed his responsive documents, Michael retained counsel, Gina Duncan. Duncan remained as Michael's counsel for several months before withdrawing in November 2023. Duncan never raised the issue of improper service during her time representing Michael. Between June and November 2023, Duncan filed additional substantive declarations as Michael's counsel. Nothing in the record suggests that Duncan was dilatory in representing Michael. Thus, the record shows that Michael more than simply retained counsel or voluntarily appeared. Michael substantively responded to the petition and acted in a manner inconsistent with an insufficient service of process defense. *See Blankenship*, 114 Wn. App. at 319.

The record shows that Michael did not raise the issue of improper service in any of his responsive pleadings filed in the trial court. Rather, Michael first raised the issue of improper service on the first day of trial. Accordingly, we hold that even if Michael was improperly served, Michael has waived his defense of insufficient service.

B.    JUDICIAL TRANSFER OF CASE

1.    Legal Principles

Parties coming before the court have the right to an impartial decisionmaker. *Godfrey v. Ste. Michelle Wine Ests. Ltd*, 194 Wn.2d 957, 959, 453 P.3d 992 (2019). "To protect this fundamental right, Washington statutes liberally allow litigants to disqualify a judge assigned to their case without establishing actual prejudice—but, usually, only before that judge has made a discretionary ruling or order in the case." *Id.*

RCW 4.12.050 allows a litigant to disqualify a superior court judge without showing actual prejudice. *Godfrey*, 194 Wn.2d at 961. RCW 4.12.050 provides, in part:

(1) Any party to or any attorney appearing in any action or proceeding in a superior court may disqualify a judge from hearing the matter, subject to these limitations:

(a) Notice of disqualification must be filed and called to the attention of the judge before the judge has made any discretionary ruling in the case.

. . . .

(d) No party or attorney is permitted to disqualify more than one judge in any matter under this section and RCW 4.12.040.

(2) Even though they may involve discretion, the following actions by a judge do not cause the loss of the right to file a notice of disqualification against that judge: Arranging the calendar, setting a date for a hearing or trial, ruling on an agreed continuance, issuing an arrest warrant, presiding over criminal preliminary proceedings under CrR 3.2.1, arraigning the accused, fixing bail, and presiding over juvenile detention and release hearings under JuCR 7.3 and 7.4.

"No judge of a superior court of the state of Washington shall sit to hear or try any action or proceeding if that judge has been disqualified pursuant to RCW 4.12.050." RCW 4.12.040(1).

PCLR 40 addresses the assignment of cases to judicial departments. The assignment of cases is the responsibility of the superior court administrator. PCLR 40(a).

PCLR 40(e)(1) provides that "[i]f the assigned judicial department is unable to hear a preassigned matter, the Court may transfer that case to the Court Administrator for reassignment." Additionally, "[i]n the event the judicial department is unable to hear a case on the date set because of a conflicting schedule, the case may be transferred to the Court Administrator for reassignment." PCLR 40(e)(2).

### 2.       No Improper Judicial Transfer

Michael argues that the superior court erred "in transferring this dissolution matter . . . without proper notice, a hearing, or a substantiated judicial conflict, violating RCW 4.12.040 and due process guarantees under the Fifth and Fourteenth Amendments." Br. of Appellant at 18. Michael also asserts that the judicial transfer "was not based on a valid judicial conflict" and was "contrary to RCW 4.12.050, which prohibits judicial reassignment after discretionary rulings have been made." Br. of Appellant at 19. Finally, Michael claims he was never notified of the reassignment, never had an opportunity to object, and the reassignment deprived him of "fair process." Br. of Appellant at 19. We disagree.

Here, the record shows that on June 23, 2023, the superior court administrator reassigned Michael and Alena's case from Judge Williams in Department 20 to Judge Chushcoff in Department 4. The reason noted for the reassignment was a "Judicial Assignment Conflict." CP at 411. The superior court sent notice of the judicial transfer to each party's counsel. At the time, Michael was represented by Duncan and Duncan was mailed a copy of the notice.

The record also shows that the case reassignment comports with PCLR 40(e)(2), which provides that if a judicial department "is unable to hear a case on the date set because of a conflicting schedule, the case may be transferred to the Court Administrator for reassignment."

21

No. 59721-7-II

Here, the civil case reassignment sheet signed by Judge Williams' judicial assistant and the court's calendar coordinator stated that the reassignment was due to a judicial assignment conflict. While Michael claims the conflict was not "substantiated," there is nothing in the record to support Michael's claim. Furthermore, Michael fails to provide any authority requiring judicial assignment conflicts be "substantiated" with something more than the civil reassignment document filed in this case.

Michael also asserts violation of RCW 4.12.040 and .050. RCW 4.12.040 provides, in pertinent part:

> (1) No judge of a superior court of the state of Washington shall sit to hear or try any action or proceeding if that judge has been disqualified pursuant to RCW 4.12.050. In such case the presiding judge in judicial districts where there is more than one judge shall forthwith transfer the action to another department of the same court, or call in a judge from some other court. In all judicial districts where there is only one judge, a certified copy of the notice of disqualification filed in the cause shall be transmitted by the clerk of the superior court to the clerk of the superior court designated by the chief justice of the supreme court. Upon receipt the clerk of said superior court shall transmit the forwarded notice to the presiding judge who shall direct a visiting judge to hear and try such action as soon as convenient and practical.
>
> (2) The presiding judge in judicial districts where there is more than one judge, or the presiding judge of judicial districts where there is only one judge, may send a case for trial to another court if the convenience of witnesses or the ends of justice will not be interfered with by such a course and the action is of such a character that a change of venue may be ordered: PROVIDED, That in criminal prosecutions the case shall not be sent for trial to any court outside the county unless the accused shall waive his or her right to a trial by a jury of the county in which the offense is alleged to have been committed.

Michael does not explain what within RCW 4.12.040 has been violated.

RCW 4.12.040 allows the removal of a judge from a case if that judge has been *disqualified* pursuant to RCW 4.12.050. A *party* may move to disqualify a judge one time so long as that party

timely files a notice of disqualification. RCW 4.12.050(1). A notice is timely so long as the judge has not made a discretionary ruling in the case, subject to certain exceptions. RCW 4.12.050(1)(a).

Here, no party requested the removal of Judge Williams pursuant to RCW 4.12.050. The superior court simply administratively reassigned the case to a different judicial department due to a judicial scheduling conflict. Furthermore, contrary to Michael's contention, RCW 4.12.050 does not prohibit judicial reassignment after discretionary rulings have been made. Rather, RCW 4.12.050 prohibits *a party* from disqualifying a judge after discretionary rulings have been made.[11]

Because the record shows that no party moved for judicial transfer, and the case reassignment from Judge Williams to Judge Chushcoff complied with PCLR 40 and other applicable statutes, Michael's claim of improper judicial transfer fails.[12]

C.    CHARACTERIZATION OF ASSETS

   1.    Legal Principles

In dissolution proceedings, courts must make a "just and equitable" distribution of the parties' property and liabilities, whether community or separate. RCW 26.09.080; *In re Marriage*

---

[11] We note that the case was reassigned from Judge Williams to Judge Chushcoff fairly early in the case—in June 2023. The only trial court order entered at the time was a "Temporary Family Law Order," entered on May 31, 2023, by a court commissioner. CP at 201. Nothing in the record suggests that *Judge Williams* had yet made any discretionary rulings at the time of the case reassignment.

[12] Despite the case being reassigned to Judge Chushcoff in June 2023 with a trial held in March 2024, Michael argues that the judicial reassignment "materially affected [his] ability to prepare for trial, challenge adverse rulings, or invoke procedural protections under the correct venue." Br. of Appellant at 20. Michael does not provide any argument beyond this single sentence. A party waives an assignment of error for which they present no argument. *Cowiche Canyon Conservancy v. Bosley*, 118 Wn.2d 801, 809, 828 P.2d 549 (1992). Accordingly, we do not address Michael's argument.

*of Larson & Calhoun*, 178 Wn. App. 133, 137, 313 P.3d 1228 (2013), *review denied*, 180 Wn.2d 1011 (2014). "The character of property . . . is determined at the time of acquisition." *In re Marriage of Schwarz*, 192 Wn. App. 180, 189, 368 P.3d 173 (2016); *see* RCW 26.16.010. Courts presume that property acquired during marriage is community property. *Schwarz*, 192 Wn. App. at 189; RCW 26.16.030. However, the presumption may be rebutted through clear and convincing evidence that the property was acquired using separate funds. *Schwarz*, 192 Wn. App. at 189.

Clear and convincing evidence requires more than "'the mere self-serving declaration of the spouse claiming the property in question that he acquired it from separate funds and a showing that separate funds were available for that purpose.'" *Id.* (quoting *Berol v. Berol*, 37 Wn.2d 380, 382, 223 P.2d 1055 (1950)). The separate funds must be traced with some degree of particularity. *Id.* Further, "'[a]s a general rule, the longer the duration of the marriage the more likely the court will assume that assets in the possession of the spouses are community.'" *Id.* at 190 (quoting 19 KENNETH W. WEBER, WASHINGTON PRACTICE: FAMILY AND COMMUNITY PROPERTY LAW § 10.4 at 137 (1997)).

"A trial court's characterization of property as separate or community presents a mixed question of law and fact." *Id.* at 191-92. The time and manner of the acquisition of an asset, for instance, is a question of fact. *Id.* at 192. "We review the factual findings supporting the trial court's characterization for substantial evidence," while the ultimate characterization of property is a question of law that courts review de novo. *Id.*

2.      Trial Court Properly Characterized Assets

Michael argues that the trial court erred by "mischaracterizing [his] separate property as community property." Br. of Appellant at 20. Specifically, Michael assigns error to the trial

court's characterization of the marital home and multiple vehicles as community property when the assets were allegedly "acquired by [Michael] after the parties' physical separation on August 1, 2013." Br. of Appellant at 20. We disagree.

a.      House

Here, the record shows that Michael and Alena married in October 2001. Michael and Alena bought their home in 2017. The trial court found that Michael and Alena did not separate until March 2023. Thus, their home is presumptively community property because it was acquired during their marriage. RCW 26.16.030; *Schwarz*, 192 Wn. App. at 189.

Michael alleges that he and Alena have an "actual separation date in 2013." Br. of Appellant at 22. He references Alena's application for disability benefits wherein she indicated that she was living apart from Michael in August 2013. The record shows that on the application, Alena wrote that she was married to Michael. Alena did *not* indicate that she and Michael were separated; rather, she selected "No" in response to the application question of whether she and Michael were *living together* at the time, which is distinct from a separation. Ex. 1, at 3. Based on the evidence in the record, Alena answered the application question truthfully insofar as, at that time, she was spending nights at the home of a friend. While the record shows that Michael and Alena perhaps had a strained marriage, nothing in the record suggests that Michael and Alena were contemplating a formal separation or divorce in 2013.

Furthermore, Michael's contention that he and Alena separated in 2013 is belied by the initial declaration he filed in response to Alena's petition for divorce. In the declaration, Michael wrote: "The evening I received the documents I thought it was a joke because I had no idea my wife of 30-years [sic] was unhappy and wanted to divorce." CP at 2057. Thus, to the extent that

Michael challenges the trial court's finding that he and Alena separated in March 2023 instead of in 2013, the evidence in the record does not support a 2013 separation date. Indeed, we note that Michael does not actually assign error to the trial court's finding of a March 2023 separation. Unchallenged findings of fact are verities on appeal. *In re Marriage of Laidlaw*, 2 Wn. App. 2d 381, 386, 409 P.3d 1184, *review denied*, 190 Wn.2d 1022 (2018).

Finally, the record shows that Michael and Alena purchased their home *together*. Alena's name is on the deed. The 2017 "contract" between Michael and Alena states that the purchase of the home was through mutual agreement. Ex. 23, at 1. In the contract, Michael stated:

> I understand . . . [the] money that I am earning [is] the money needed to run the household and pay the bills for the purchases I have chosen and the family I have created. By purchasing this home I understand that it is OUR money.
>
> . . . I acknowledge that I understand that my wife is disabled, and has been disabled since 2008. That she is not able to help me in accruing any additional funds through gainful employment.
>
> . . . .
>
> . . . I acknowledge and understand that by signing this document that I am signing it to prove to my wife my state of mind in asking her to purchase this home with me.

Ex. 23, at 2.

Because the record shows that Michael and Alena acquired their home during their marriage, and that they jointly decided to purchase the home, the trial court did not err when it characterized the home as community property.

b.       Vehicles

Michael argues that "[his] automobiles—including a Tesla, Dodge Charger, and Kia" were "acquired after separation" and "misclassified as community assets." Br. of Appellant at 21. We disagree.

i.       Tesla

The record shows that the trial court characterized the Tesla as Michael's separate property. Thus, the trial court did not misclassify the Tesla as community property as Michael claims.

Further, Alena acknowledged the Tesla was a post-separation asset. And the record shows Michael purchased the Tesla after he and Alena separated in March 2023. Thus, substantial evidence supports the trial court's finding that the Tesla was separate property. *Schwarz*, 192 Wn. App. at 192. Therefore, the trial court did not err when it classified the Tesla as Michael's separate property.

ii.       2020 Dodge Charger

Michael and Alena owned a 2020 Dodge Charger. Alena testified that they had the vehicle at the time of their separation in March 2023. Thus, the record shows that Michael and Alena acquired the Dodge Charger during their marriage. Accordingly, the Dodge Charger is presumptively community property. RCW 26.16.030; *Schwarz*, 192 Wn. App. at 189.

Michael fails to rebut the presumption of community property. *Schwarz*, 192 Wn. App. at 189. He argues that Alena "never appeared on the titles, financing, or insurance documents, nor provided maintenance or payment support." Br. of Appellant at 21. The record shows that Alena conceded she was not listed on the vehicle titles. However, whether Alena is listed on a vehicle

title is not determinative of a community property or separate property classification. *See Schwarz*, 192 Wn. App. at 189; *see* RCW 26.16.010.

Michael also references the trial transcript and Exhibits 65-71 to support his contention. Those portions of the record, however, undercut his claim. For instance, Exhibit 65 is a vehicle title document for a *2009 Camry*, on which Alena is listed as a co-owner. The only exhibit pertaining to the Charger is a Kelley Blue Book screenshot regarding the Charger's value. Furthermore, Michael's argument assumes a separation date in August 2013. As discussed above, the record does not support a separation date in 2013, and the trial court's finding that the date of separation is March 2023 is unchallenged and a verity on appeal.

Because the record shows that the Dodge Charger was acquired during the marriage, and Michael fails to demonstrate through clear and convincing evidence that the Charger was a separate asset, the trial court did not err in classifying the Charger as community property.

### iii. 2018 Kia and 2019 Lexus

The trial court characterized the Kia—or at least, its proceeds—and the Lexus as community property. During trial, Alena testified that she and Michael possessed a 2018 Kia and 2019 Lexus just before their separation. As with the Charger, the Kia and Lexus are presumptively community property. RCW 26.16.030; *Schwarz*, 192 Wn. App. at 189.

Similar to the case with the Charger, Michael fails to rebut this presumption beyond citing to his self-serving declaration. *Schwarz*, 192 Wn. App. at 189. Accordingly, the trial court did not err when it characterized the Kia and Lexus as community property.

D.    DIVISION OF ASSETS

      1.    Legal Principles

In dissolution proceedings, courts shall "make such disposition of the property and the liabilities of the parties, either community or separate, as shall appear just and equitable after considering all relevant factors."  RCW 26.09.080.  The factors include:

> (1) The nature and extent of the community property;
> (2) The nature and extent of the separate property;
> (3) The duration of the marriage . . . ; and
> (4) The economic circumstances of each spouse . . . at the time the division
> of property is to become effective, including the desirability of awarding the family
> home or the right to live therein for reasonable periods to a spouse.

RCW 26.09.080.

Trial courts have broad discretion to determine what is just and equitable based on the facts of each case.  *In re Marriage of Doneen*, 197 Wn. App. 941, 949, 391 P.3d 594, *review denied*, 188 Wn.2d 1018 (2017).  A "'[j]ust and equitable distribution does not mean that the court must make an equal distribution.'"  *Larson*, 178 Wn. App. at 138 (quoting *In re Marriage of DewBerry & George*, 115 Wn. App. 351, 366, 62 P.3d 525, *review denied*, 150 Wn.2d 1006 (2003)).  Further, a "just and equitable division 'does not require mathematical precision, but rather fairness, based upon a consideration of all the circumstances of the marriage, both past and present, and an evaluation of the future needs of parties.'"  *Id.* (quoting *In re Marriage of Crosetto*, 82 Wn. App. 545, 556, 918 P.2d 954 (1996)).  Fairness is not attained by utilizing inflexible rules; rather, it is achieved through consideration of all the circumstances and the exercise of discretion.  *Id.*

"Because the trial court is in the best position to determine what is fair, this court will reverse its decision only if there has been a manifest abuse of discretion."  *Doneen*, 197 Wn. App.

at 949. A trial court abuses its discretion if "it bases its decision on untenable grounds or acts for untenable reasons or if the decision is manifestly unreasonable." *In re Marriage of Byerley & Cail*, 183 Wn. App. 677, 685, 334 P.3d 108 (2014).

> A court's decision is manifestly unreasonable if it is outside the range of acceptable choices, given the facts and the applicable legal standard; it is based on untenable grounds if the factual findings are unsupported by the record; it is based on untenable reasons if it is based on an incorrect standard or the facts do not meet the requirements of the correct standard.

*In re Marriage of Littlefield*, 133 Wn.2d 39, 47, 940 P.2d 1362 (1997). A trial court also abuses its discretion if a finding from which the court has drawn a conclusion of law is not supported by substantial evidence. *Byerley*, 183 Wn. App. at 685. Substantial evidence is evidence that "would persuade a rational, fair-minded person of the finding's truth." *Id.*

2.     No Abuse of Discretion

Michael argues that the trial court erred by awarding Alena "significant portions of [Michael's] assets . . . despite uncontroverted evidence that [Alena] made no financial or material contribution to their acquisition, maintenance, or improvement." Br. of Appellant at 23. Specifically, Michael challenges the trial court's award of house to Alena, and he alleges the "same inequity occurred with respect to [Michael's] vehicles, including a Tesla, Dodge Charger, and Kia." Br. of Appellant at 24.

Here, the record shows that the trial court characterized the Tesla as Michael's separate property and awarded the Tesla *to Michael*. Additionally, even though the trial court characterized the Charger and Kia proceeds as community property, both were awarded to Michael as well.

Thus, Michael's contention that the trial court ordered him to "turn over possession and equity in these vehicles" is unavailing.[13]  Br. of Appellant at 24.

Michael's primary challenge to the distribution of assets appears to be the trial court's award of the house to Alena.  Michael argues it was inequitable for the trial court to award Alena the house when the record establishes that the house had been bought with Michael's income and Michael exclusively paid the mortgage, utilities, property taxes, and expenses.

Here, the trial court awarded Alena the house, which had a fair market value of $613,276.  However, Alena was also awarded the liability associated with the house, which was a $527,394 outstanding mortgage at the time of trial.  Furthermore, the trial court awarded Michael a $20,000 lien on the house "for an equitable division [of] the community estate."  CP at 59.  With the lien, the ultimate property division resulted in a 56.38/43.62 percent split between Alena and Michael, respectively.  This percentage split, while short of being exactly 50/50, is relatively equal.  In the final divorce order, the trial court wrote:

> [Alena] receives a disproportionate division of the marital estate 56.38/43.62 with a compensating lien of $20,000.  This modestly disproportionate award is justified by [Alena]'s lesser earning potential.  For many years, [Alena] has been disabled by injuries sustained in multiple motor vehicle accidents.

CP at 59.

The record supports the trial court's finding that Alena has a lesser earning potential than Michael.  Alena has a high school education and completed less than a year of college.  Alena, who was 54 at the time of trial, testified that she has not worked since 2008 on the recommendation of her doctors.  There is considerable evidence in the record of Alena's injuries and her physical

---

[13]  Michael does not challenge the trial court's award of the 2019 Lexus to Alena.

disability following several car accidents. Alena has no source of regular income—indeed, she testified that she will need to sell the house because she cannot afford to keep it.

Michael claims that Alena worked as a delivery driver at the time of trial and that the 2019 and 2020 tax returns submitted into evidence show income she allegedly earned. Contrary to Michael's contention, his and Alena's 2019 and 2020 tax returns do not show that Alena had any income. The record shows that in 2021, Alena received an income of $1,127 from DoorDash. However, during trial, Alena testified that she had no source of income, disability benefits, or other government assistance. There is no other evidence in the record, beyond Michael's assertions, that demonstrates Alena has a regular income or could maintain a regular income.

The record also shows that Michael has a substantial income. In a financial declaration he filed in July 2023, he indicated a gross monthly income of $10,147. His paystubs and earnings statements submitted into evidence during trial also support this amount. The record further shows that Michael is a Teamsters union member and has been since December 1999. Thus, based on Michael's employment history and Alena's age, disability, and lack of employment history, substantial evidence supports the trial court's finding that Alena has a lesser earning potential than Michael.

The trial court also explicitly noted Michael's and Alena's circumstances. In the final divorce order, the trial court acknowledged that Michael and Alena had had a "marriage of 21+" years, and based on their committed intimate relationship prior to marriage, their "joint relationship [was] 30 years." CP at 60. The trial court wrote that Alena "has not been [employed] since 2008. She has been declined for social security disability benefits. She has no independent source of income and she is unlikely to have such an income in the foreseeable future." CP at 60. Thus, the

record shows the trial court considered the factors of RCW 26.09.080 in terms of the nature and extent of community property, the duration of the marriage, and Michael's and Alena's respective economic circumstances. Moreover, a 56.38/43.62 percentage split is only "modestly disproportionate," as noted by the trial court. CP at 59. The trial court's property distribution evaluated the needs of the parties and is just and equitable given the circumstances. *Larson*, 178 Wn. App. at 138. Therefore, the trial court did not abuse its discretion in its division of assets.[14]

E.       AWARD OF SPOUSAL MAINTENANCE

       1.       Legal Principles

In Washington, spousal maintenance is governed by RCW 26.09.090. *See generally* RCW 26.09.090; *In re Marriage of Wilcox*, 3 Wn.3d 507, 519, 553 P.3d 614 (2024). RCW 26.09.090 provides:

> (1) In a proceeding for dissolution of marriage . . . the court may grant a maintenance order for either spouse . . . . The maintenance order shall be in such amounts and for such periods of time as the court deems just, without regard to misconduct, after considering all relevant factors including but not limited to:
>        (a) The financial resources of the party seeking maintenance, including separate or community property apportioned to him or her, and his or her ability to meet his or her needs independently, including the extent to which a provision for support of a child living with the party includes a sum for that party;
>        (b) The time necessary to acquire sufficient education or training to enable the party seeking maintenance to find employment appropriate to his or her skill, interests, style of life, and other attendant circumstances;

---

[14] In his reply brief, Michael also argues that the trial court erred in his income calculation because it assumed full-time employment, which he is allegedly no longer able to sustain due to recent orthopedic injuries that affect his ability to work. Michael claims this was known to the trial court at the time of trial. However, the record shows that Michael departed the trial and never returned to testify or submit evidence. During trial, there was no mention of Michael's orthopedic injury or his purported inability to work. Furthermore, the record shows that evidence of Michael's orthopedic injury or inability to work did not arise until post-trial hearings, which was well after the trial court had entered the final divorce order and after Michael had filed a notice of appeal.

(c) The standard of living established during the marriage or domestic partnership;

(d) The duration of the marriage . . . ;

(e) The age, physical and emotional condition, and financial obligations of the spouse . . . seeking maintenance; and

(f) The ability of the spouse . . . from whom maintenance is sought to meet his or her needs and financial obligations while meeting those of the spouse . . . seeking maintenance.

Under RCW 26.09.090, "'the only limitation placed upon the trial court's ability to award maintenance is that the amount and duration, considering all relevant factors, be just.'" *Wilcox*, 3 Wn.3d at 520 (quoting *In re Marriage of Washburn*, 101 Wn.2d 168, 178, 677 P.2d 152 (1984)). The spouse requesting maintenance need not establish financial need as a prerequisite to receiving support. *Id.* at 522-23. Spousal maintenance "is meant to be 'a flexible tool by which the parties' standard of living may be equalized for an appropriate period of time.'" *Id.* at 520 (quoting *Washburn*, 101 Wn.2d at 179). Ultimately, the primary consideration must be the parties' economic conditions after divorce. *Id.* at 520-21.

Trial courts have broad discretion to award spousal maintenance. *Id.* at 517. A trial court's disposition will only be overturned if the trial court has abused its discretion. *Id.* "'A trial court abuses its discretion if its decision is manifestly unreasonable or based on untenable grounds or untenable reasons.'" *Id.* (quoting *In re Marriage of Anthony*, 9 Wn. App. 2d 555, 563, 446 P.3d 635 (2019)). Failure to give the statutory factors fair consideration may constitute an abuse of discretion. *Id.* at 521.

2.      No Abuse of Discretion

Michael argues that the trial court "failed to evidence a fair consideration of the suggested statutory factors." Reply Br. of Appellant at 30. Specifically, Michael contends the trial court

abused its discretion when it awarded Alena half of Michael's retirement and allegedly failed to account for his own drop in income after retirement. We disagree.

Here, the trial court awarded Alena spousal maintenance of $3,000 per month for 60 months, or until Michael retires, whichever occurs first. After Michael retires, Alena's spousal maintenance would reduce to $1,500 per month, which would terminate either on the death of either party or Alena's remarriage. Additionally, the trial court awarded Alena half of Michael's retirement accrued up until the date of their separation. Any retirement accruals Michael earned after their date of separation constituted his separate property.

The trial court considered the duration of the marriage and Alena's education, physical condition, and age. The trial court also considered Michael's age, employment history, regular income, and access to retirement funds. Based on these circumstances, the trial court found, "[Alena] clearly has a need of support." CP at 60. The trial court further found that:

> Like many couples, the parties have not been successful living within their financial means. But they have the capacity to do so. For example, [Michael] could save nearly $1,000/month by selling the Dodge Charger and using [the] proceeds to also pay off his . . . line of credit. [Alena] cannot afford the home she is receiving and will need to sell it to reduce her monthly living expenses. With appropriate prudence, [Michael] is capable of paying spousal maintenance.

CP at 61.

Michael argues that the indefinite spousal maintenance award to Alena "fails to account for his own drop in income after retirement or disability." Reply Br. of Appellant at 30. However, the record shows that the trial court did account for Michael's drop in income upon his retirement. Either after 60 months or Michael's retirement, *whichever occurs first*, the spousal maintenance amount would reduce from $3,000 per month to $1,500 per month.

35

Michael also argues that the trial court erred in considering Alena's income as $0, "even though she was working part time and earning income as a delivery driver." Reply Br. of Appellant at 31. However, Michael fails to cite to any evidence in the record demonstrating that Alena earns a regular income. Accordingly, for the reasons discussed in the preceding section, the trial court did not err when it considered Alena's income as $0.

Michael next asserts that the trial court's calculation of Alena's expenses do not accurately reflect her future economic circumstances as she intends to sell the home and find less expensive housing. While the record reflects Alena's intention to sell the home and find other housing, the record also shows that the house needed considerable repairs prior to any sale, and the mortgage and HOA (homeowners association) payments were in arrears, along with other unpaid utility bills. In light of these considerations, it could take Alena a significant amount of time to prepare the home for sale, during which she would be responsible for the mortgage payment. Thus, it was not unreasonable for the trial court to list her monthly housing expenses as the mortgage payment.

Finally, Michael claims that the trial court failed to "adequately account" for Michael's retirement because Alena was awarded half of his retirement account and social security benefits, plus $1,500 per month in support. Reply Br. of Appellant at 31. Michael asserts that the award does "not equalize the parties' income but place[s] [Alena] in a superior financial position not supported by the evidence." Reply Br. of Appellant at 31. We disagree.

Michael's argument is similar to his first argument—that the trial court failed to account for changes in circumstances after his retirement. Again, as discussed above, the record shows that the trial court did account for Michael's retirement and took his income and ability to pay into consideration. The trial court even suggested ways for Michael to pay off lines of credit and save

funds based on the assets he was awarded. Indeed, Michael was awarded several vehicles, each worth tens of thousands of dollars, along with a $20,000 lien as an equalization amount. The trial court stated: "With appropriate prudence, [Michael] is capable of paying spousal maintenance as set forth below," indicating that the trial court gave fair consideration to the factors outlined in RCW 26.09.090. CP at 61; *Wilcox*, 3 Wn.3d at 521.

Because the trial court has broad discretion to award spousal maintenance and the record shows that the trial court fairly considered the factors listed in RCW 26.09.090, the trial court did not abuse its discretion in its award of spousal maintenance to Alena.

F.     JUDICIAL BIAS

1.     Legal Principles

Parties are guaranteed the right to an impartial judge. *In re Marriage of DeVogel & Padilla*, 22 Wn. App. 2d 39, 57, 509 P.3d 832 (2022). However, a party "must submit proof of actual or perceived bias to support a claim of appearance of impartiality." *In re Marriage of Rounds*, 4 Wn. App. 2d 801, 808, 423 P.3d 895 (2018). This court presumes the trial court "perform[s] its functions regularly and properly without bias or prejudice." *In re Marriage of Meredith*, 148 Wn. App. 887, 903, 201 P.3d 1056, *review denied*, 167 Wn.2d 1002 (2009). "A finding that a party lacks credibility does not mean the judge is biased." *Rounds*, 4 Wn. App. 2d at 808.

2.     No Evidence of Bias

Michael argues that the trial court "failed to maintain neutrality and made statements that displayed disbelief and impatience." Br. of Appellant at 25. Michael supports his argument by asserting the trial court denied his oral motion to dismiss at the beginning of trial "without holding an evidentiary hearing, despite conflicting evidence regarding service." Br. of Appellant at 25-26.

Michael requests "reversal and remand for proceedings before a different judicial officer." Br. of Appellant at 27. We disagree.

Michael's assertions of judicial bias are belied by the record. The record shows that the trial court fully entertained Michael's claims and engaged in extensive dialogue with him regarding the alleged lack of service. The trial court examined Brester, the individual who served Michael, under oath to confirm that Michael was properly served. The trial court also expressly offered Michael an opportunity to question Brester himself, which Michael declined. And contrary to Michael's assertion that his request for a recess was disregarded, the record shows that the trial court granted the recess Michael requested to allow him to contact an attorney. Beyond his repeated claim of improper service, Michael has failed to offer any evidence of improper service.

Also, Michael's claim that the trial court "never allowed [him] an opportunity to . . . present witness testimony to rebut the presumption of proper service" is simply not supported in the record. Reply Br. of Appellant at 32. The record shows that well after the trial court denied Michael's motion to dismiss the case for lack of service, and after there had been a recess for Michael to contact an attorney, Michael requested to call a witness "before the trial." VRP at 23. The trial court informed him that he would have an opportunity to do so once Alena, the petitioner, presented her case first. In response, Michael decided to leave the courtroom.

"A finding that a party lacks credibility does not mean the judge is biased." *Rounds*, 4 Wn. App. 2d at 808. Because Michael presents no evidence of bias other than what appears to be his personal disagreement with courtroom procedure, the trial court's rulings, and the trial court's final division of assets, we hold there was no judicial bias.

G.      ATTORNEY FEES ON APPEAL

Both Michael and Alena request attorney fees on appeal pursuant to RAP 18.1(a) and RCW

26.09.140.  We award attorney fees to Alena.

Under RAP 18.1, we may award attorney fees to a party if "applicable law grants to a party

the right to recover reasonable attorney fees or expenses."  RAP 18.1(a).  RCW 26.09.140

provides:

> The court from time to time after considering the financial resources of both parties
> may order a party to pay a reasonable amount for the cost to the other party of
> maintaining or defending any proceeding under this chapter and for reasonable
> attorneys' fees or other professional fees in connection therewith, including sums
> for legal services rendered and costs incurred prior to the commencement of the
> proceeding or enforcement or modification proceedings after entry of judgment.
>        Upon any appeal, the appellate court may, in its discretion, order a party to
> pay for the cost to the other party of maintaining the appeal and attorneys' fees in
> addition to statutory costs.
>        The court may order that the attorneys' fees be paid directly to the attorney
> who may enforce the order in his or her name.

Under RCW 26.09.140, courts "must consider the party's relative need versus ability to pay."

*Anthony*, 9 Wn. App. 2d at 568.

As discussed in the preceding sections, Alena has no income and less earning potential than

Michael.  Michael has a regular, substantial income.  Thus, Alena has need and Michael has the

ability to pay.  *Id.*  Accordingly, we award attorney fees to Alena.

CONCLUSION

We affirm.

No. 59721-7-II

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Lee, P.J.

We concur:

Cruser, J.

Che, J.